UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-14040-CIV-COHN

SCOTT FINESTONE and REBECCA FINESTONE,
individually, and as parents and friends of
ZACHARY FINESTONE

     Plaintiffs,

vs.

FLORIDA POWER & LIGHT COMPANY,

     Defendant.

_____/

FILED by _____ D.C.

**JAN 0 6 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD

CASE NO. 04-14128-CIV-COHN

TISH BLAKE and JOHN LOWE, as Personal
Representatives of the Estate of Ashton Lowe,
on behalf of the Estate of Ashton Lowe and
TISH BLAKE and JOHN LOWE as the
surviving parents of ASHTON LOWE,

     Plaintiffs,

vs.

FLORIDA POWER & LIGHT COMPANY,

     Defendant.

_____/

## OMNIBUS ORDER RE MOTIONS TO EXCLUDE EXPERTS AND SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Plaintiffs' Motion for Partial Summary

Judgment [DE 288 in Case No. 03-14040],[1] Defendants' Motion for Final Summary

---

[1]Although nearly all the motions in these two cases were separately filed in each
case, Plaintiffs' motion for partial summary judgment does not appear in the record of
Ashton Lowe's case. However, the motion itself was filed with both case numbers on
its face. Therefore, the Court has construed the motion as having been filed in both
cases. In general, all issues in these two cases are the same except for the fact that
Ashton Lowe and Zachary Finestone had different types of cancer. Thus, the specific
causation issue is different, though general causation and other liability issues are the



Judgment [DE 289 in Case No. 03-14040 and DE 257 in Case No. 03-14128],[2] **Plaintiffs'**
**Motions to Strike/Exclude Defense Experts Poston, Hunter, Boice, Mattson, and Daniel**
[DE 294-321,[3] 298/264, 300/266, 301/267 and 302/268], Defendant's Motions to
Exclude Expert Testimony of Waligora, Gale, Resnikoff, Sharma, Gundersen, Busby
and Dollinger [DE 303/269, 305/271, 307/273, 309/275, 311/277, 314/279, 317/282],
Plaintiffs' Motions to Exclude Defense Experts Meadows, Hall, Hunter, Frazier,
Montgomery, and Heber [DE 326, 327, 335/291, 337/293, 350/303, 352/305], **Plaintiffs'**
**Motions for hearing or oral argument regarding expert witnesses** [DE 329, 337-2/293-2,
338, 350-2/303-2, 353/306, 361/311], and Plaintiffs' Dispositive Motion to Strike FPL's
Pleadings, or such relief as this Court deems appropriate and just [DE 456/404]. The
Court has carefully considered the motions, has heard the argument of counsel and
taken the testimony of witnesses on December 21, 22, 23 and 27, 2005, and is
otherwise fully advised in the premises.

### I. GENERAL BACKGROUND

Plaintiffs[4] brought these actions for negligence relating to alleged releases of

---

same in both cases.

[2] From here on, the Court will refer to the two docket entry numbers in each
case separated by a "/" with the first number referring to the docket entry number of
Case No. 03-14040 and the second number after the slash the docket entry number of
Case No. 03-14128.

[3] It appears that Plaintiff Lowe's motion to strike the opinion of Defendant's
expert, Dr. John W. Potson, Sr., was filed in Plaintiff Finestone's case, resulting in two
docket entries as to Dr. Potson in Case No. 03-14040 and no entry in Case No. 03-
14128. The Court treats the motion as having been filed in both cases.

[4] Although the true plaintiffs are the parents of Zachary Finestone and Ashton
Lowe, both minors (Ashton Lowe is now deceased), the Court will use the term

radioactive material from the Florida Power & Light Company ("FPL" or "Defendant") nuclear power plant located on Hutchinson Island, near the town of Port St. Lucie, Florida, with federal jurisdiction present under the Price-Anderson Act, 42 U.S.C. § 2210.  Plaintiffs allege that FPL has breached various duties to limit releases, which Plaintiffs allege caused injury to them in the form of cancer, specifically neuroblastoma (Finestone case) and medullablastoma (Lowe case).  Upon a motion filed by FPL, this Court held that the standard of care in this action "is set forth by the Radiation Dose Limits for Individual Members of the Public applicable for the time of the releases in question."  See Finestone v. Florida Power & Light Co., 319 F.Supp.2d 1347 (S.D.Fla. 2004); 10 C.F.R. § 20.1301(a)(1).

## A.  History of Plant's Sewage Sludge "Incident"

FPL's nuclear plant, known as the St. Lucie reactor, began operations in 1976.  In 1975, during construction of the plant, a wash "trough" (also called a "sink") was installed for workers in the radiation control area.  Report on Released Contaminated Sewage Sludge, Chronology, Exhibit C to FPL's Motion in Limine to Exclude Testimony About Any Radionuclides Other Than Co-60 in Material Recovered from the Glades Cutoff Site [DE 371/322] (hereinafter, "Bailey Report").  In 1978, the "trough began to be used for decontaminating respirators and similar items."  Id.[5]  At this time, the sewage went to a

---

"Plaintiffs" to generally refer to the children.  There are no issues in this case as to the standing of the personal representatives or next friends.

[5] The State of Florida's report of the incident states that a sink located in the radiation controlled area had been used to wash various reusable items such as respirators and mops, and had been connected to the sanitary sewage system by mistake.  Summary of Activities in Connection with St. Lucie #1 Contaminated Sludge Disposal, October 1, 1982, State of Florida Department of Health and Rehabilitative

septic tank that was emptied daily by truck and shipped to the Fort Pierce Sewage Treatment Plant as regular liquid sewage.  See Report No. 50-335/82-33 by the Nuclear Regulatory Commission, November 9, 1982, Report Details I at p. 2, App. 11 to Plaintiffs' Appendix to Memorandum of Law in Opposition to Motion for Final Summary Judgment [DE 349/380][6] (hereinafter, "NRC Report").  On December 4, 1979, the nuclear plant began operating an on-site sewage treatment plant, where this material began to be processed.  Id.; Bailey Report.  In June of 1980, the NRC issued new directives to nuclear plants to begin monitoring sewage sludge releases.  Plaintiffs' Exhibit 3 at Daubert hearing.  On January 8, 1982, and June 22, 1982, sludge from the sewage treatment plant was pumped out and trucked to the Glades Cutoff site for dispersal onto the field at that site.  Plaintiffs' Exhibit 1 at Daubert hearing (Bates # 178919); NRC Report Details I at p. 2.  This location was a licensed and regulated sludge dumping site, but was not licensed to receive nuclear contaminated sewage.

On September 10, 1982, the wash trough/sink described above clogged.  See NRC Report Details I at p. 1.  The sink was isolated over the weekend, with no record of anything being done about the sink during these three days.  Id.  On September 13, 1982, in an attempt to repair the drain, FPL noticed that the sink had been incorrectly plumbed.  The Bailey report states that FPL notified the Nuclear Regulatory Commission

Services ("FDHRS"), Plaintiffs' Appendix 14 to Memorandum of Law in Opposition to Motion for Final Summary Judgment [DE 349/380] (hereinafter, "FDHRS October 1, 1982 Report").

[6] Reference to Plaintiffs' Appendix to Memorandum of Law in Opposition to Motion for Final Summary Judgment [DE 349/380] shall hereinafter be to "Plaintiffs' App. X."

verbally on September 13 and the Florida Office of Radiation Control on September 14, 1982. Sampling conducted by FPL on September 14, indicated the presence of radioactive material in lines and sludge tanks, confirming that the sink has been incorrectly plumbed at the time of construction because it was sending radioactive waste water to a location where it was not intended to be present.

On September 15, 1982, inspectors from State of Florida Department of Health and Rehabilitative Services ("FDHRS") arrived at the plant and, with FPL personnel, drove to the disposal company's office to identify the location and number of sludge dumps from the plant. Summary of Activities in Connection with St. Lucie #1 Contaminated Sludge Disposal at p. 1, October 1, 1982, State of Florida Department of Health and Rehabilitative Services ("FDHRS"), Plaintiffs' App. 14 (hereinafter, "FDHRS October 1, 1982 Report"). The state inspectors then traveled to the dump site at Glades Cutoff with a chemist from the disposal company and FPL personnel. Id. A gamma survey was done of the woods, field 1B and field 3. The first two locations were negative, but elevated gamma radiation appeared at field 3. Id. FDHRS personnel took soil and grass samples and brought them to the state lab in Orlando. At the lab, they found Cobalt-60 was found in the soil samples. Id. at p. 2.

On September 16, 1982, FDHRS personnel spoke with the disposal company's owner, who indicated that two shipments of sludge occurred at the Glades Cutoff site, one on field 2A and one on field 3. In addition to ground gamma surveys, FPL lent a helicopter to do an aerial survey of the entire approved dump area. Id. Cobalt-60 contamination was found in field 3. That afternoon, FPL brought in equipment to remove the contaminated soil into low specific activity waste containers. Removal had

not begun when the FDHRS personnel left for the day to return to Orlando.

On September 17, 1982, FHRS personnel returned with more sophisticated testing equipment. When they arrived at Field 3 that afternoon, FPL crews had already excavated the contaminated soil to a depth of 4 inches. Id. at 3. Plaintiffs have asserted that this removal occurred in haste and was inadequate. However, the FDHRS report states that the FDHRS crew surveyed the area identified by the helicopter survey as having radioactive contamination and "found that a large area by the swamp was contaminated, although the levels appeared to be lower than the first contaminated area." Id. Thirty-two additional samples were taken. In addition, the NRC inspector, Daniel Montgomery, met with the FDHRS team to discuss decontamination levels.

Many other samples were taken over the next two weeks, and further removal of contaminated soil occurred. NRC Report, Report Details II at p. 3, ¶ 6.a ("licensee excavated the upper layer of soil and grass in the 20 ft. x 60 ft. contaminated area down to a depth of 6 to 12 inches."). The FDHRS report concluded on October 6, 1982, that the State:

> has surveyed extensively the areas of Cobalt 60 contamination both before and after the Florida Power and Light Company's decontamination efforts. Based on the decontamination limit of five (5) picocuries per gram [pCi/g] averaged over one square meter. . . Florida Power and Light Company has achieved adequate decontamination. Post clean up maximum activities' levels were no greater than one-half the decontamination limit. These data were from samples taken at the sites of greatest gamma exposure levels remaining after the decontamination.

FDHRS October 1, 1982 Report at 7.

Of critical importance is the final NRC report of the incident, which concluded that "it is unlikely that anyone received a measurable radiation dose." NRC Report, Report

6

Details II at p. 4. The NRC also sampled the sludge at the plant's sewage treatment facility and found small levels of Cobalt-60, below the dose limit. Id., Report Details I at p. 2. The NRC Report also explains that this tested sludge at the plant in September 1982 would have been more concentrated than the daily shipments of sludge to the Fort Pierce Sewage Treatment plant from 1978 through December 4, 1979. Id.

### B. Plaintiffs' Strontium-90 Exposure

Plaintiffs have put forth evidence that elevated levels of Strontium-90 (Sr-90) were found in the baby teeth of Ashton Lowe and Zachary Finestone, and that such Sr-90 could only have reached Plaintiffs from Defendant's nuclear plant. Strontium-90 is only produced by nuclear fission and is present in the environment from atmospheric weapons testing and from nuclear plants, particularly the large release from the Chernobyl disaster. Thus, the timing of Plaintiffs' possible exposure is an issue in this case. Ashton Lowe was born in March of 1988, six years after the Glades Cutoff sludge incident. He lived in Port St. Lucie for his entire life, though prior to his birth his mother lived nearby in Stuart, Florida. See Tab 3 to Appendix to Statement of Undisputed Facts in Support of Defendant's Motion for Final Summary Judgment [DE 292]. He was diagnosed with meduollablastoma on February 10, 1995, and died in 2001. Zachary Finestone was born in 1994. He lived in Fort Pierce until August of 1995, in Port St. Lucie for three years thereafter, in Stuart for one year, and since August of 1999 in Jensen Beach, Florida. He was diagnosed with neuroblastoma in 2000, and remains alive today, though he remains afflicted with this type of cancer. Plaintiffs' experts assert that all of these locations are within seven (7) miles of the Glades Cutoff site, or even closer to waterways connected to the liquid effluent from the plant.

At the outset of the case, the Court notes that Plaintiffs were not specific in their theory of the pathway of exposure, whether by air, water or food, or by a combination of all three pathways. Plaintiffs' opposition brief to Defendant's motion for summary judgment focuses on the Glades Cutoff sludge release as the cause of contamination; however, during the extensive Daubert hearings, Plaintiffs seem to leave open their theory of exposure by all three of these possible pathways. As to the issue of releases, Plaintiffs appear focused on the sludge incident, although expert Arnold Gundersen makes certain allegations regarding other possible radiation releases from the plant.

Turning back to the Sr-90 evidence, Plaintiffs had the deciduous baby teeth of both Plaintiffs tested by Dr. Hari Sharma in Canada. He reported that elevated levels of Sr-90 were present. It is undisputed that Sr-90 acts similarly to calcium in human tissue, and can be found in bone within humans that have been exposed. It is undisputed that Sr-90 emits ionizing radiation that can harm human cells and is only created by nuclear fission reactions, such as nuclear power plants and nuclear weapons testing. It is also undisputed that Sr-90 is present in the environment in St. Lucie County, and has been found in citrus fruit since before the St. Lucie nuclear plant came online. See Expert Report of John A. Daniel, Addendum to Investigation of Potential Sources of Children Blake and Finestone, October 17, 2005 (Defendant's Exhibit 3 from Daubert hearing at pp. 3-8). Defendant asserts that all of the Sr-90 in St. Lucie County (as in the rest of Florida) is here as a result of atmospheric weapons testing and the 1986 Chernobyl nuclear plant disaster. Expert Report of John Daniels, September 2, 2005 at pp. 1-5, 13-14, 19-22, Exhibit A to Defendant's Reply in Support of its Motion for Final Summary Judgment [DE 428]. Plaintiffs disagree, and ask the Court to submit the question of the

8

origin of the Sr-90 to the jury.  The Sr-90 teeth evidence is the only evidence, **other than** Plaintiffs' cancers, that radiation reached Plaintiffs.

## II.  PROCEDURAL BACKGROUND

As further background for this Order, the Court addresses various **suggestions by** Plaintiffs' counsel during the four-day <u>Daubert</u> hearings regarding the compressed timetable over the past two months for discovery, summary judgment motions, **Daubert** motions and <u>Daubert</u> hearings.  As noted by the Court at the status conference **held on** November 21, 2005 [DE 286], the Court continued the trial and pretrial deadlines in this case on at least five (5) occasions.[7]  The Court notified the parties on November **15,** 2005, that the <u>Daubert</u> hearings (if requested), would begin on December 21, **2005 [DE** 283/252].  A hearing was requested in writing beginning with Defendant's motions to exclude filed on December 1, 2005.

### A.  Adverse Inference Regarding Late Disclosed Documents

On November 23, 2005, this Court entered an Order regarding Plaintiffs' objections to an order by Magistrate Judge Frank Lynch regarding Plaintiffs' **motions for** sanctions on Defendant's alleged discovery abuse for not producing certain **documents:**

_____

[7] These cases were filed on February 7 and May 9, 2003, and were originally assigned to Senior District Judge Norman Roettger.  On August 12, 2003, both cases were reassigned to the undersigned.  On October 9, 2003, the calendar call for both cases was set for June 17, 2004 [DE 30/22].  On December 4, 2003 and June 1, 2004, the Court granted the parties' joint motions to continue, resetting the trial first for January 2005, and then again to June 2005 [DE's 44/37, 87/67].  On November 22, 2004, the Court granted in part Plaintiffs' motion to continue and extended pretrial deadlines but kept the trial setting for June 2005 [DE 155/140].  On February 7, 2005, the Court granted Plaintiffs' motion to continue, resetting the case for October 2005 [DE 179/162].  Finally, on May 23, 2005, in granting Plaintiffs' motion to enlarge the time for expert reports, continued the trial to January 9, 2006 [DE 210/192].

In this case, Plaintiffs assert that Defendant violated Judge Lynch's February 3, 2005 order granting in part Plaintiffs' motion to compel information regarding external releases. While Defendant did violate this order by not producing the Bailey Report regarding the sludge discharge of 1982, this Court concludes, upon a de novo review, that Judge Lynch's order denying the motion to strike pleadings should be affirmed. The broad discretion that this Court has in fashioning remedies for discovery abuse does not include striking of the pleadings in this instance. U.S. v. Certain Real Property, 126 F.3d at 1317.

Having concluded that the ultimate sanction is not appropriate, the Court will exercise its discretion in sanctioning Defendant in a less severe manner. The Court agrees with Plaintiffs that Defendant's success in its legal arguments that narrowed the scope of discovery to external releases makes Defendant's failure to disclose a report on such an external release prejudicial. Plaintiffs' other grounds for sanctions are also relevant in this regard, particularly Defendant's failure to properly prepare its Rule 30(b)(6) witnesses. One of those witnesses was the author of the undisclosed Bailey Report regarding the 1982 sludge leakage incident.

In his Order, Judge Lynch concluded that because Plaintiffs did not specifically seek a lesser sanction, that he would only extend discovery for Plaintiffs for six weeks. Plaintiffs object to this ruling stating that their motion did seek "other relief." The Court agrees. In their objections, Plaintiffs state that the Court could award an adverse inference and jury instructions and/or reasonable attorneys' fees and costs. In its response, Defendant does not address any lesser sanction, stating that Plaintiffs' motion did not seek lesser relief.

The Court concludes that Plaintiffs are entitled to the lesser sanction of an adverse inference in the form of a jury instruction that Defendant did not timely produce the Bailey Report. See Inmuno Vital, Inc. v. Telemundo Group, Inc., 203 F.R.D. 561, 574 (S.D.Fla. 2001) (cases cited therein). Such a sanction is considered one of the least severe, and therefore is appropriate in this case.

*Order Denying Plaintiffs' Motion to Strike Experts* [DE 287/256] (footnote omitted).

Defendant has sought to have this ruling reconsidered, while Plaintiffs seek to extend this ruling to the burden of proof at trial, on summary judgment, and on the Daubert motions. In fact, during the Daubert hearing, Plaintiffs' counsel requested that once Plaintiffs show a breach of the monitoring requirement at the St. Lucie plant (not

10

that a release occurred in excess of the dose limit, but just a monitoring breach),[8] the Court should shift the burden of proof on dose and causation.  On January 3, 2006, Plaintiffs again moved to strike Defendant's pleadings.  After the Daubert hearings concluded, Plaintiffs received additional State of Florida documents from September, 1982, produced pursuant to a subpoena.  Plaintiffs assert that such state testing documents should have been produced by Defendant much earlier in response to Plaintiffs' discovery requests.[9]

The Court rejects Plaintiffs' request for additional relief.  With regard to expert discovery, Plaintiffs were granted additional time and had their experts opine on the Bailey Report.  Also, it is too great a leap from failure to turn over a company report on a publicly disclosed and governmentally investigated incident to shifting the burden of proof, whether on a motion to exclude an expert or on liability issues.  Justice would not be served by the imposition of such an extreme measure, which under the facts of this case would come close to the striking of Defendant's pleadings.

The Court recognizes that Plaintiffs have alleged, and Defendant has not rebutted the allegations, that certain plant records regarding three days in mid-September 1982, when the sludge incident was first discovered, remain missing and were perhaps destroyed long before this case began.  See Amended Expert Report of Arnold

---

[8] The NRC Report cited Defendant for such a monitoring breach in 1982 for the sludge incident.

[9] The handwritten notes received from the state, dated September 15, 1982, indicate the possible presence of an additional radioactive isotope prior to FPL's remediation of the Glades Cutoff site (remediation began on September 16, 1982).  However, the final DHRS report does not mention this particular isotope, Ruthenium-106.  Exhibit D to Plaintiffs' Dispositive Motion [DE 456/404].

Gundersen, Plaintiffs' App. 1 at pp. 8-9 (hereinafter, "Gundersen"); Plaintiffs' Exhibit 3 at Daubert hearing.  In addition, the Court recognizes that after delayed release of the Bailey report, certain other documents from 1982 were found at the St. Lucie plant in an abandoned desk of a former worker.  However, as noted below, the NRC and the State of Florida both investigated the sludge incident on site at that time and concluded that though there were monitoring violations, a release over the dose limit did not occur.  The NRC Report was produced by Defendant in February 2005 and has always been available from the NRC.[10]

## B. Motion to Strike Publicly Available Documents

Although Plaintiffs rely upon the NRC Report in their own motion for partial summary judgment and in their opposition to Defendant's final summary judgment motion, Plaintiffs move to strike the NRC reports and subsequent Florida Department of Health reports under the theory that the Court had previously ordered Defendant to produce all public records, thus obviating the need for Plaintiffs to ferret out the reports on their own.  The Court concludes that such a motion should be denied for several reasons.  First, the discovery order in this case did not absolve Plaintiffs of their own

---

[10] Plaintiffs have alleged via testimony by Arnold Gundersen that they had a representative appear at the public document room at the Nuclear Regulatory Commission and request all documents regarding the St. Lucie plant, but they either did not receive the 1982 NRC Report regarding the sludge incident or, upon receipt of thousands of pages, did not find it.  Gundersen at p. 10.  In addition, Plaintiffs have put forth the Affidavit of Jamie Payne, a privately-retained investigator who is an "expert in the research of public records."  Plaintiffs' Daubert Exhibit 16 at ¶ 7.  Payne describes the various efforts he undertook to obtain State of Florida documents that relate to the St. Lucie nuclear plant.  Even in considering these efforts by Plaintiffs and Defendant's untimely disclosures, the record in this case does not indicate that the burden should be shifted as dramatically as requested by Plaintiffs.

responsibility to obtain publicly available documents (the Court notes that Plaintiffs have documented their efforts, see n. 10, *supra*).  Second, the reports were eventually produced, and Plaintiffs received extra time for expert discovery, as well as time to file otherwise late challenges to Defendant's rebuttal experts.

### III. DISCUSSION

The pending motions for summary judgment are inextricably linked to the motions to exclude expert testimony.    Plaintiffs' evidence supporting their claim that Defendant breached its duty and caused their injuries necessarily rests upon the admission of expert testimony to explain how a radiation release in excess of the dose limit occurred, and how such a release caused injury to Plaintiffs, both in terms of general and specific causation.  Therefore, the Court will address all of these motions together.

### A. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the

13

basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. at 249-50.

## B. Elements of Negligence Action under PAAA

Under the Price-Anderson Act, 42 U.S.C. § 2014(hh), the federal courts must apply state law for an injury claim due to radiation releases by a nuclear plant. To state a

claim for negligence under Florida law, a plaintiff must allege a duty of care owed by the defendant to the plaintiff, breach of that duty of care, causation, and resulting damages. Mosby v. Harrell, 909 So.2d 323, 327 (Fla. Dist. Ct. App. 2005). This Court has previously held that the duty of care in this action "is set forth by the Radiation Dose Limits for Individual Members of the Public applicable for the time of the releases in question." See Finestone v. Florida Power & Light Co., 319 F.Supp.2d 1347 (S.D.Fla. 2004) (hereinafter, "May 19 Order"). Such dose limits may currently be found at 10 C.F.R. § 20.1301(a)(1).[11]

As Defendant points out, Plaintiffs must also show a pathway of exposure from the plant to Plaintiffs, as either part of the dose limit exposure or as part of causation analysis. With regard to causation, in a toxic tort situation, Plaintiffs must show both general causation (that radiation causes cancer) and specific causation to the individual plaintiffs (whether plaintiffs were exposed to the toxin, whether plaintiffs were exposed to enough of the toxin to cause the alleged injury, and whether the toxin in fact caused the injury. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1239 (11th Cir. 2005).[12]

Plaintiffs move for partial summary judgment on the issue of "whether the Defendant unlawfully discharged radioactive materials into the environment external to

---

[11] The parties agree that prior to January 1, 1994, the dose limit was 500 millirem, as stated in 20 C.F.R. §§ 20.105 and 20.106. Plaintiffs assert, however, that under the language in §§ 20.105 and 20.106 at that time, a plaintiff need only show a release of 500 mrem, rather than an exposure by an individual to that amount. See Plaintiffs' Memorandum of Law in Support of Their Response to Defendant FPL's Motion for Final Summary Judgment [DE 346/302] at pp. 2-4, citing Good v. Fluor Daniel Corp., 222 F.Supp.2d 1236, 1248 (E.D.Wa. 2002).

[12] Plaintiffs dispute that the legal standard for toxic chemical causation applies to a radiation case. That issue will be discussed in subsection D.6, infra

the nuclear power plant. . . ."  Plaintiffs' Motion for Partial Summary Judgment at 1 [DE 288].  Plaintiffs rely almost entirely on the NRC report of the Glades Cutoff sludge incident in support of their argument.  Defendant opposes the motion on grounds that a partial summary judgment on this issue would only confuse the jury, as simply releasing any radioactive material is not an element of Plaintiffs' claims; rather, the issue is the amount of release in relation to the regulatory dose limit.

The Court agrees with Defendant.  While the NRC Report is clearly admissible, as Plaintiffs assert in their motion, as a public record or report under Federal Rule of Evidence 803(8), it only proves that a release occurred, but does not show that a release in excess of the dose limit occurred.  In fact, as explained below, the NRC Report expressly found that "it is unlikely that anyone received a measurable radiation dose" as a result of the sewage sludge incident.  NRC Report, Report Details II at p. 4.

Defendant moves for final summary judgment on the issues of whether its duty was breached, and if such a breach occurred, whether the breach caused Plaintiffs' injuries.  As noted above, for the most part Plaintiffs' assertion of disputed issues of material fact rest upon expert testimony to create such a dispute.  Therefore, the Court must first decide the numerous motions to exclude experts filed by both parties in this case.

## C.  Motion to Exclude Expert Standard

Under the United States Supreme Court decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993):

> scientific expert testimony is admissible when "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently

16

>reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue". . . .Any proffer of scientific evidence is also subject to other rules of evidence. . . [including] Rules 401, 402, 403, 702 and 703.

Allison v. McGhan Medical Corp.,184 F.3d 1300, 1309 (11th Cir. 1999) (quoting City of

Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

The Eleventh Circuit has also recognized "the intricate role of Rule 403 in an

expert testimony admissibility analysis . . . [as the Supreme Court] noted that expert

testimony could be 'both powerful and quite misleading because of the difficulty in

evaluating it.'" Allison, 184 F.3d at 1310 (quoting Daubert, 509 U.S. at 595). The Court

is mindful of Rule 403 throughout its analysis of the motions to exclude experts in this

case.

In addressing the reliability of expert methodology, "[d]istrict courts 'have

substantial discretion in deciding how to test an expert's reliability . . . .'" Rink v.

Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (quoting United States v. Majors,

196 F.3d 1206, 1215 (11th Cir. 1999)). "Daubert instructs courts to consider the

following factors: (1) whether the expert's theory can be and has been tested; (2)

whether the theory has been subjected to peer review and publication; (3) the known or

potential rate of error of the particular scientific technique; and (4) whether the technique

is generally accepted in the scientific community." McCorvey v. Baxter Healthcare

Corp., 298 F.3d 1253, 1256 (11th Cir. 2002); Quiet Technology DC-8, Inc. v. Hurel-

Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (citing Daubert, 509 U.S. at

593-94). This "test of reliability is 'flexible,' and Daubert's list of specific factors neither

17

necessarily nor exclusively applies to all experts or in every case." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

In assessing the reliability of a study, the Federal Judicial Center ("FJC") notes that every study has some flaws. Has the study been duplicated? The strength and consistency of any associated studies is relevant. How much departure from general acceptance is there? How much error or bias exists? Such bias can be "conceptual bias," "systemic bias," or "population bias" (sample size). The FJC panel also referenced the "Bradford Hill" criteria, which include (1) the strength of association; (2) consistency of association; (3) specificity of association; (4) temporality; (5) biological gradient or dose-response relationship; (6) plausibility; (7) coherence; (8) experimental evidence; and (9) analogy. See Cano v. Everest Minerals Corp., 362 F.Supp.2d 814, 821, n.10 (W.D.Tex. 2005).

The relevancy portion of the Court's Daubert analysis is often referred to as "fit." In Allison, the Eleventh Circuit described this analysis as a requirement that:

> [T]he evidence must have a valid scientific connection to the disputed facts in the case. Daubert, 509 U.S. at 591, 113 S.Ct. 2786 (holding "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . . Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility"). This connection has been appropriately denominated as "fit." Id.

Allison, 184 F.3d at 1312. In the present case, Defendant asserts that several of Plaintiffs' experts present testimony that does not "fit" the disputed facts in this case.

The burden on these motions to exclude rests with the proponent of the expert. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1238, n.2 (11th Cir. 2005).

18

## D.  Analysis of Expert Testimony

On December 21, 22, 23 and 27, 2005, the Court held <u>Daubert</u> hearings on numerous expert witnesses for both sides.  Some of the proceedings consisted of two hour evidentiary hearings on particular experts, while some of the time consisted of one hour oral arguments as to particular experts, all dependent upon whether a party requested a hearing or just oral argument.  In some cases, the parties called other experts to testify in support of a motion to exclude, or in opposition to a motion to exclude.  The Court will not address each and every expert subject to a motion, if such a ruling is not necessary to reach a conclusion as to the motion for final summary judgment.

### 1. Plaintiffs' Expert Arnold Gundersen

In opposition to Defendant's motion for summary judgment on the issue of dose and the pathway of exposure, Plaintiffs submit the expert report of Arnold Gundersen, a nuclear engineer who has participated in a number of decommissioning projects for private companies and state public service commissions.  His report is put forth principally to describe how much more radiation was released through the sludge dumped at Glades Cutoff than argued by FPL.[13]  Amended Expert Report of Arnold

---

[13] Gundersen also spends several pages relating his opinion regarding FPL's inadequate discovery responses in this case.  Gundersen Amended Report at pp. 8-9. He also attacks FPL's monitoring program for radioactive releases. <u>See</u> <u>also</u> Notice of Filing Report of Dr. Michael Quinn in Support of Plaintiffs' Opposition to Defendant's Motion for Final Summary Judgment [DE 347].  Dr. Quinn extensively analyzed FPL's liquid Radioactive Effluent Discharge Reports from 1976 through 2000, and concluded that inconsistencies, inadequacies, and errors in these reports made it possible that releases occurred.  However, his report does not actually show that releases in excess of the dose limits occurred.

Gundersen, Plaintiffs' App. 1. Gundersen's methodology for his dose calculation is based upon measurements FPL reported for waste shipped in 1991 to a federal nuclear waste depository. Gundersen opines that the record of 828 cubic feet of sludge shipped in 1991 matches the approximate amount of material FPL excavated from the Glades Cutoff site in 1982 and brought back to the reactor site. Using decay calculations of radioactive isotopes, Gundersen extrapolates backwards in time to come up with four different scenarios of how the 1991 shipment data of .0448 curies would have measured: 1) 0.15 curies in 1982 when dumped at Glades Cutoff if all 1991 material was excavated by FPL; 2) .05 curies per month if 1991 shipment contained sludge present in septic tank in September, 1982 when sink clogged uncovered problem (sludge from June 1982 to September, 1982); or other amounts under his other two scenarios.[14]

Gundersen also bases his source term in part upon Plaintiffs' other source term experts, Drs. Resnikoff and Waligora. The problems with their methodology will be described in the next section. Gundersen also uses a handwritten note from a state employee on certain routine sampling of citrus fruits for the presence of Strontium-90. The note states: "This is 'normal' for citrus. No telephone report. 6-24-83 DT." Unnumbered exhibit from Daubert hearing, FPL Bates # 010894. However, the Sr-90 tests of citrus fruits in 1983 included amongst the seven pages of samples containing

_____

[14] Though Gundersen principally discussed the presence of Cobalt 60 in the sludge, he also opines that other radioactive isotopes, including Sr-90, were present. However, the basis for that assumption is not clear. At the Daubert hearing, he testified as to certain gamma spectrography readings that may support his claims. However, Daniel Montgomery testified that if more radioactive isotopes than Co-60 were present at Glades cutoff, the spikes on the gamma tests would not have been missed by him on site at the time.

this handwritten note range from a low of 13.06 pCi/kg to a high of 67.37 pCi/kg. Unnumbered exhibit from Daubert hearing, FPL Bates # 010892-898.   Moreover, as noted above, the history of Sr-90 sampling of citrus fruits by the State of Florida indicates that the background level of strontium in St. Lucie County before operation of the plant,  from 1971 through 1976, is 40pCi/kg.  Expert Report of John A. Daniel, Addendum to Investigation of Potential Sources of Children Blake and Finestone, October 17, 2005 (Defendant's Exhibit 3 from Daubert hearing at p. 3)

A significant defect in the reliability of Gundersen's theory is that a real world "test" of his theory exists in the form of actual sample results completed by government agencies in 1982.  Those results refute his theory.  Gundersen states that the best way to determine the radioactivity of what was dumped at Glades Cutoff in 1982 would have been for FPL to test the floor drain back at the plant that was incorrectly connected to the sewage plant.  The NRC report indicates that the sewage at the plant was tested and did not reveal a measurable dose of radiation.  NRC Report, Report Details I at p. 2 (see p. 6, *supra*).  In addition, Gundersen's theory has not been subjected to peer review and publication, and there is a large potential rate of error if his assumptions are incorrect.

Defendant also attacks Gundersen's assertion that the entire January 1982 radioactive sludge dump (consisting of all sludge from December 4, 1979, through January 1982), an amount four times greater than the June 1982 dump, dispersed into the drinking water.  The Court notes that Gundersen is a nuclear engineer, with a Masters in Engineering from Rennselear Polytechnic Institute ("RPI").  Although he includes the official rainfall tables for the Fort Pierce area for 1982 to support his

21

assertion of an abnormally high amount of rainfall that year, the Court concludes that he does not provide a methodology for computing the amount of radioactive runoff into the soil and water aquifer.  Gundersen simply assumes, based upon some calculations of waste shipped offsite in 1991, that all of the sludge dumped in January 1982 dispersed into the soil, water, and groundwater around the Glades Cutoff site, and then formed a "plume" of radioactivity that reached Plaintiffs.[15]

The Court concludes that Gundersen's Expert Report and Amended Expert Report must be excluded pursuant to the Daubert standard.  Gundersen's dose calculations are belied by the contemporaneous reports of the NRC and the FDHRS regarding the amount of radioactive material released at the Glades Cutoff site, and by the state studies of background Sr-90 levels in citrus fruits since before operation of the plant.  In addition, Gundersen has no qualifications to testify as to soil or water movement around the site.  Finally, the Court notes that his report is rife with conclusory statements that are not supported by attached documentation.[16]

---

[15] Gundersen at one point used the phrase "complicated hydrological evidence" to describe the runoff process, but he never provides any scientific basis to support his runoff conclusions.  Gundersen Amended Expert Report at 27.  In opposition to the motion for summary judgment, Plaintiffs include an expert report from Dr. Ronald K. Christenson, an environmental engineer with a Ph.D. in civil and environmental engineering, with expertise in hydrology and water movement.  Plaintiffs' App. 8.  Dr. Christenson opines in a rather general form that given the abundance of rain in the area and the sandy soils, any contamination would have spread along any natural or manmade drainage system and settled into the groundwater.  Though Dr. Christenson has no apparent expertise with regard to radioactive material, his opinion is not challenged by Defendant.

[16] When Gundersen does provide a citation to support an assertion, he merely provides a Bates page number.  However, the copy of his amended report attached to support Plaintiffs' memorandum in opposition to Defendant's motion for summary judgment contains no attachments.  Although Plaintiffs later filed nearly all expert

## 2.  Plaintiffs' Experts Drs. Marvin Resnikoff and Stanley Waligora[17]

Drs. Marvin Resnikoff and Stanley Waligora submitted expert reports that opine that the sludge dumped at Glades Cutoff site contained 245 pCi/g of radioactive isotopes.  Dr. Waligora's background in radiochemsitry included many years working for the United States military monitoring the health effects of nuclear weapons maintenance at the Nevada test site and for the Public Health Service (a function eventually performed by the Environmental Protection Administration).  Dr. Waligora also worked for many years for Eberline Laboratories, a large testing company.

Waligora testified that he took results from 32 samples from the Glades Cutoff site that contained measurable Co-60 levels, but eliminated any samples with no Co-60. This results in a finding of 245.53 pCi/gm of radioactivity just from Co-60.  In his opinion, waste from a nuclear fission facility could not consist of only Co-60, but must have included other radioactive isotopes.  To compute the amount of these other isotopes, he used the ratios contained in the plant's FSAR report, a pre-operation report required by the NRC.  This calculation resulted in a yearly dose to a person living on the site to be 19,870 mrems per year, of which 1890 mr/y are from Co-60.

_____

depositions and deposition exhibits, the Court is not under an obligation to search a voluminous record to verify record citations.  The Court also notes that Plaintiffs' memorandum itself, when a record citation is actually made, cites only to an entire expert report without a specific page citation.  Though the Court has spent numerous hours reviewing the voluminous record in these cases, the seriousness of Plaintiff's allegations and Defendant's alleged discovery failures do not absolve counsel from providing sufficient record citation to enable the Court to review such evidence

[17]  Plaintiffs did not put forth separate evidence to support Dr. Resnikoff's testimony at the Daubert hearings, though argument was held as to Dr. Resnikoff. Because their report was jointly authored by Drs. Resnikoff and Waligora, the Court will consider Defendant's motions to strike their testimony together.

Defendant attacks Resnikoff/Waligora's expert testimony on several grounds. First, Waligora did not use all 59 samples from Glades Cutoff. When asked by the Court why he did not include the samples that did not contain Co-60, he did not have a justified answer. Defendant's expert John Daniel calculated that when the other 27 data points are included, the true average is 22 pCi/gm. Expert Report of John A. Daniel, Addendum to Rebuttal of Selected Plaintiffs' Expert's Reports: Investigation of 1982 Sludge Event, October 17, 2005 (Defendant's Exhibit 4 from Daubert hearing at p. 13). This number corresponds with the 1982 NRC Report which contained measurements indicating that the Co-60 levels averaged 23 pCi/gm. Id.

Defendant next asserts that Waligora's use of the FSAR isotope ratio assumes that spent fuel rod waste water ended up in the sewage sludge even though that waste is located in a separate building at the plant. Thus, the FSAR isotope ratio creates an improper extrapolation.[18] Rink, 400 F.3d at 1294 (expert testimony excluded because of methodology used in extrapolations to derive temperature data). Related to this attack on the reliability of Waligora's study is the assumption that Cesium, a more radioactive isotope than Cobalt, was present in the sludge at Glades Cutoff, when the NRC and

---

[18] In a case reversed on appeal on other grounds, the Eighth Circuit described the district court's findings in a CERCLA action: "Moreover, the court disagreed with Waligora's assertion that a dose rate could be extrapolated from the plaintiffs' concentration-level figures alone. According to the court, such an extrapolation directly contradicted EPA guidelines dictating that dose levels must reflect site-specific factors, and therefore could not be considered 'generally acceptable.'" Johnson v. James Langley Operating Co., Inc., 226 F.3d 957, 961 (8th Cir. 2000). This is the same Dr. Stanley Waligora as in this case.

DHRS found only Cobalt-60, accounting for an error of 90 percent of the dose.[19]   Finally,
Defendant specifically attacks their methodology by arguing that they used the wrong
dose exposure computer calculation by using RESRAD rather than RESRAD Offsite.
Since Plaintiffs lived off the site of the sludge dump area, a proper dose calculation with
the Offsite program results in an exposure below the dose limit.   Expert Report of Dr.
Poston regarding NRC Offsite Dose Calculation Method ("ODCM").[20]

 Thus, although Waligora and Resnikoff are qualified to testify, the reliability of
their methodology has not been sufficiently shown.   As with Gundersen, their
assumptions as to the presence of the amount and type of radioactive isotopes fail the
"test" of their theory – as their extrapolations cannot stand next to the actual data
retrieved from the site and surrounding environment.   Also, the submitted report has not
been subjected to peer review and publication.   As discussed above, the error rate of
their particular scientific technique in this case is quite large.   Waligora based part of his
assumption on hand-written notes that the Co- 60 finding is "biased very high."   More
importantly, Waligora cannot adequately explain why he chose only the 32 samples with
Co-60 and not the remaining samples that had no Co-60 to compute the average
amount of Co-60 at the Glades Cutoff site.

 The Court thus concludes that Defendant's motions to exclude the expert

---

[19]   Dr. Waligora conceded on the stand during the Daubert hearings that in
analyzing the the radioactivity of the sludge as it might have reached Plaintiffs via
Gundersen's "plume" theory, Cesium -134 has a two year half life and would have been
greatly reduced by the time of Ashton Lowe's birth in 1988. Thus, even if Cs-134 was
present, it would have decayed prior to even possibly following a pathway to reach
Plaintiffs.

[20]   Plaintiffs' motion to strike Dr. Poston is discussed infra.

testimony of Resnikoff and Waligora must be granted.  Though "a court should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate,"  McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004), "the court can draw inferences about the methodology from the conclusions."  McClain at 1243, n.8 (citing Joiner, 522 U.S. at 147).  Put another way, "a district court may properly consider whether the expert's methodology has been contrived to reach a particular result."  Rink, 400 F.3d at 1293 n. 7.  As with Gundersen, Resnikoff and Waligora's false assumptions make their methodology unreliable.

### 3.  Plaintiffs' Expert Christopher Busby

Defendant also seeks to exclude the expert testimony of Dr. Chris Busby.  Dr. Busby opines that his analysis of the water pathway (sea to land transfer) of ionizing radiation from Defendant's plant to Plaintiffs and their mothers leads to his conclusion that radiation from Defendant's plant substantially contributed to the children's cancers.  See Expert Report of Chris Busby, PhD, Plaintiffs' App. 6.  Busby's dose analysis, however, is based upon the Resnikoff/Waligora and Gundersen dose source term, which the Court has excluded (see supra).[21]  In addition, Dr. Busby opines that the physics-based dose calculations used by the International Committee on Radiological Protection ("ICRP") are unreliable.  He claims the ICRP method has been repudiated by recent research, particularly as to low level radiation causing cancer in children near

---

[21]  Bubsy also testified that he assumed that Sr-90 uptake in apples and berries (in studies done in the United Kingdom) is the same as Sr-90 in citrus grown in Florida, but he has no knowledge of whether this uptake is chemically similar.  Furthermore, his assumptions as to the background level of Sr-90 in St. Lucie County is unreliable based upon the actual citrus sampling done by the State of Florida.

Chernobyl.  Dr. Busby argues that doses as low as 20 mrem can contribute to cancer in children.  However, as explained above, this Court is limited by statute and regulation to a mandated dose limit of 100 or 500 mrem (depending upon whether the pre-1994 standard is used).  Thus, though the Court does not take issue with Dr. Busby's methodology per se, his opinion regarding the water pathway theory does not fit the admissible evidence in the case, and therefore cannot sustain Plaintiff's burden on summary judgment, as there remains no evidence that a dose over the Price-Anderson Act threshold has occurred as a result of Defendant's operation of its nuclear plant.

### 4.  Plaintiffs' Expert Hari Sharma

Plaintiffs have put forth the expert opinion of Dr. Hari Sharma to testify regarding the strontium-90 levels found in Plaintiffs' teeth.  Defendant has challenged the methodology of Dr. Sharma and his "Tooth Fairy Project."  Plaintiffs support Dr. Sharma's opinion through the testimony at the Daubert hearing of Dr. Anderson, a Ph.D. in inorganic chemistry.  She testified as to the reliability of the chemical analysis process undertaken by Dr. Sharma and his lab in Canada to deduce the amount of Sr-90 in deciduous baby teeth.  On cross-examination, Defendant brought out that Dr. Anderson does not have expertise in measuring radionuclides or the amount of Sr-90 in Florida citrus.  Through the testimony of John Frazier, Defendant brought forth evidence regarding the background levels of Sr-90 in Florida's environment and that Dr. Sharma did not fully isolate the Sr-90, resulting in an overcount of Sr-90.  Frazier also testified that it was impossible to verify the tests without a complete data package describing the tests.

The Court concludes that Plaintiffs have met their burden to allow Dr. Sharma's

27

report and testimony regarding the levels of Sr-90 to be considered by the Court in opposition to the motion for final summary judgment.[22]

### 5. Plaintiffs' Motions to Strike Defendants' Experts

Plaintiffs' motions to strike Defendant's Experts John Poston (releases from plant did not exceed NRC dose limit), Roger Mattson (same as Dr. Poston), John Daniel (rebuttal to Dr. Sharma regarding Sr-90 levels), and John Frazier (rebuttal to Drs. Sharma and Resnikoff/Waligora regarding Sr-90 evidence) are all principally based upon attacking the sufficiency of the documents provided to the witness for his reliance. Plaintiffs assert that FPL and its counsel selectively gave these witnesses certain documents and calculations, and therefore their testimony is incomplete.   Plaintiffs cite to United States v. Masferrer, 367 F.Supp.2d 1365 (S.D.Fla. 2005), wherein Judge James Lawrence King noted that "proffered expert testimony will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  However, Plaintiffs generally do not attack these witnesses' qualifications or methodology.  Such an attack in this particular case goes more to the weight of these witnesses' testimony rather than the admissibility.  Incomplete knowledge of the record can be sufficiently explored on cross-examination.  This situation is different from the Court's decision to strike certain testimony of Plaintiffs' experts.  The stricken experts' methodology becomes flawed as assumptions of facts underlying the methodology (such as the source term of Gundersen and Resnikoff/Waligora) are at odds with the

---

[22] As will be discussed below, this evidence does not meet Plaintiffs' burden to show where the Sr-90 came from, but is evidence that Sr-90 was present in Plaintiffs' deciduous baby teeth at the level asserted by Dr. Sharma.

28

contemporaneous public records of the Glades Cutoff incident.  The Court concludes that Defendant has met its burden as the proponent of these experts.

However, with regard to Plaintiffs' motions to strike Defendant's experts Richard Hunter and Sharon Heber as mere mouthpieces for counsel's argument regarding state DOH environmental reports of the neighborhoods surrounding the St. Lucie plant, the Court concludes that it has been sufficiently educated on epidemiological issues that it can review the state health department data without reliance on these defense experts.

Finally, with regard to Defendants' expert Daniel Montgomery, Plaintiff asserts that Montgomery cannot serve as both a fact witness and a paid expert witness.  Daniel Montgomery was the NRC inspector on the scene at Glades Cutoff in 1982.  He no longer works for the NRC but has been retained as an expert by Defendant.  During this argument in the <u>Daubert</u> hearing, the Court asked Plaintiffs' counsel how this arrangement differs from that of a treating physician who is also an expert in a personal injury case.  Although Plaintiffs attempted to distinguish the situations, the Court does not view the present case as dissimilar.  Nonetheless, the Court will disregard Daniel Montgomery's testimony as an expert, and will only consider his testimony as a fact witness, present at Glades Cutoff in 1982.

6.  General Causation and Specific Causation Experts

As noted above, Plaintiffs must show both general causation and specific causation.  General causation "has been defined by courts to mean whether the substance at issue had the capacity to cause the harm alleged, while 'individual

29

causation'[23] refers to whether a particular individual suffers from a particular ailment as a result of exposure to a substance." In re Hanford Nuclear Reservation Litigation, 292 F.3d 1124, 1133 (9th Cir. 2002). In the Eleventh Circuit, "[t]he threshold for concluding that an agent more likely than not caused a disease is 2.0." Allison, 184 F.3d at 1315 n.16 (11th Cir. 1999).

Plaintiffs put forth several experts who opined that radiation causes cancer. Plaintiffs further argue that all they need to show for general causation is that because radiation can cause deleterious changes to cells at the chromosomal level, such cells are more likely to become cancerous. Defendant argues that the proper framing of the issue is whether radiation in the amount and form allegedly released from the plant causes medullablastoma or neuroblastoma, the diseases suffered by Plaintiffs.

Plaintiffs further assert that cell damage from radiation exposure has no dose threshold. Plaintiffs specifically argued at the Daubert hearing that the Court not follow the exact requirements of those decisions from the Eleventh Circuit, such as McClain, 401 F.3d at 1241-42, and Allison, supra, regarding expert testimony on the dose-response relationship, since radiation is qualitatively different from toxic chemical agents that generally do have a dose threshold.

Plaintiffs rely upon a statement in In re Hanford Nuclear Reservation Litigation, 292 F.3d at 1137, stating that the district court erred in that case by requiring greater than a 2.0 relative risk level for radiation exposure. The Hanford decision however, stemmed from a district court's summary judgment on plaintiffs' failure to show individual

---

[23] Sometimes "individual" causation is referred to as "specific" causation.

causation where the district court had bifurcated discovery and the plaintiff had only been able to conduct general causation discovery. 292 F.3d at 1135.  The Ninth Circuit relied upon the Third Circuit's decision in In re TMI Litigation, concerning health claims stemming from the Three Mile Island nuclear plant accident, that "scientists assume that there is no threshold for the induction of cancer" from radiation.  In re TMI Litigation, 193 F.3d 613, 726-27 (3ᵈ Cir. 1999).

The expert testimony during the Daubert hearings in the present case is mixed as to whether radiation in fact has a dose threshold.  For example, Defendant's expert Dr. Eric Hall, a professor at Columbia University Medical School for over thirty (30) years, testified that while it is true in general that "radiation causes cancer," epidemiological studies show that there are different types of cancer that may be linked to the type and dose of radiation.  He explained that radiation can have a "stochastic" effect, that is either cancer causing chromosomal changes in cells occur or they do not.[24]  However, while the severity of the resulting cancer is not related to dose, the probability of the chromosomal change which leads to cancer is reduced with a lower radiation dose.[25]

Plaintiffs' expert Dr. Malin Dollinger opined that ionizing radiation causes cancer in children.  Dollinger Expert Report, Plaintiffs' App. 9.  Such causation not only occurs during their lifetime, but can also occur while still a fetus.  Both experts discussed the

---

[24]  By contrast, a chemical agent is more likely to have "deterministic" effects, in which both onset and severity of resulting disease is dose-related.

[25]  For a detailed explanation the effect of ionizing radiation on human chromosomes, see Allen v. United States, 588 F.Supp. 247, 318-322 (D. Utah 1984), rev'd on appeal on other grounds, 816 F.2d 1417 (10ᵗʰ Cir. 1987), cert. den. 484 U.S. 1004 (1988) (district court found that fallout caused leukemia and thyroid cancer in Federal Tort Claims Act suit).

epidemiological studies performed following the use of nuclear weapons upon Japan, the successive Biological Effects of Ionizing Radiation ("BEIR") reports (published by the National Academy of Sciences), and several reports published by the United Nations Scientific Committee on the Effects of Atomic Radiation ("UNSCEAR").[26]

Defendant asserts that there is no reliable evidence that ionizing radiation causes the particular cancers suffered by Plaintiffs, and seeks to exclude Dr. Dollinger (and Plaintiffs' individual causation expert Dr. Robert Gale) on grounds that their methodology is unreliable.  With respect to Dr. Dollinger's methodolgy, Defendant argues that he would find any level of radiation release to cause cancer.  FPL notes that Dr. Dollinger was excluded as an expert on this ground in Cano v. Everest Minerals Corp., 362 F.Supp.2d 814 (W.D. Tex. 2005).  In that case, involving cancer allegedly caused by exposure to ionizing radiation from uranium ore dust by persons living near mines and truck routes, the district court stated:

> Because he rejects the importance of dose and fails to consider the dose information in forming his opinions, Dr. Dollinger's testimony is inadmissible. Dr. Dollinger also lacks scientific information defining any allegedly harmful level of exposure. He can cite no studies reporting that ionizing radiation increases the risk of any of the forms of cancer in this case at the doses alleged by Plaintiff's dosage witness. Defendants argue that, had he performed the necessary research, Dr. Dollinger would have discovered that there is no scientific support for the idea that uranium and its decay products cause any form of cancer at the doses alleged in this

---

[26] The Court notes that the Eleventh Circuit stated in McClain that a government report assessing the risk of injury from a substance is of marginal relevance to estimating causation in a particular individual.  401 F.3d at 1249 (citing David L. Eaton, *Scientific Judgment and Toxic Torts* at p. 34, Science for Judges I: Papers on Toxicology and Epidemiology, 12 J.L & POL'Y 1 (2003)).  In the present case, the Court notes that for a public liability action under the PAAA, the NRC has established the dose that is the breach of duty.  As noted in McClain, however, causation must still be proved.  401 F.3d at 1250.

case.

Cano, 362 F.Supp.2d at 837.[27]

The Court concludes that each side has met their burden to allow each side's general causation experts to testify, if the Court were to otherwise deny the motion for summary judgment. It remains a dispute in the scientific community whether radiation has a threshold dose for the cancers suffered by Plaintiffs.

However, as to individual causation, Dr. Gale, Plaintiffs' medical expert, testified that he based his dose calculations on the Resnikoff expert report. In a toxic pesticide exposure case decided last year by the Eleventh Circuit, the Court reached a similar conclusion as this Court reaches in the present case:

> [W]e find that the district court properly excluded the toxicology experts and the physicians who treated the putative class representatives. The district court found that the excluded experts relied on [other excluded expert's] findings, which we have found to be unreliable. Moreover, without . . . foundational testimony that the [toxic substance] was defective because it contained elevated levels of isomalathion, the testimony of the toxicologists--regarding the usual symptoms of isomalathion exposure--and the testimony of the treating physicians-- regarding the congruence between these symptoms and the ailments allegedly suffered by the class representatives--is irrelevant.

Rink, 400 F.3d at 1294. Thus, while the Court finds Dr. Gale qualified, and his methodology sound, the fit of his testimony is lacking, as he has based his conclusion on other excluded experts.

---

[27] Because Dr. Dollinger was the only expert to show specific causation, the court in Cano granted summary judgment to defendants. Cano, 362 F.Supp. 2d at 858-59. This Court notes that Dr. Dollinger relied upon Dr. Resnikoff for dose calculations in the Cano case. Id. at 826-27. The district court in Cano did not reach the question of whether Dr. Resnikoff should be stricken since Dr. Dollinger was stricken and specific causation could not be shown. In this case, the Court need not decide whether Dr. Dollinger should be stricken as Defendant's breach of the dose limit cannot be shown.

## E.  Return to Summary Judgment Motion Analysis[28]

Having concluded that Plaintiffs' experts Gundersen, Resnikoff, and Waligora must be excluded in the face of contemporaneous government reports and data regarding radiation releases from Defendant's nuclear plant, the Court returns to its analysis of the summary judgment motion.  In opposition to the motion, Plaintiffs also rely upon the expert report of Paul Blanch, Plaintiffs' App. 5, whose opinion has not been challenged by Defendant.  Blanch is listed as an "energy consultant," but there is no curriculum vitae or educational history attached to his report.

Blanch reports that there was an additional shipment of contaminated sludge from the St. Lucie reactor to Glades Cutoff on September 17, 1981 and to the Fort Pierce Sewage Treatment Plant on April 15, 1980.  Expert Report of Paul Blanch, Plaintiffs' App. 5 at 12.  Though Blanch cites to "Exhibits" by number (unlike Gundersen), there are no exhibits attached to his report.  His conclusions are that hundreds of shipments of unmonitored liquids and sludge containing radioactive fission products were released to the environment and that FPL violated NRC regulations regarding monitoring and reporting.  Plaintiffs' App. 5 at 64-65.  However, Blanch does not discuss an amount of radiation or specifics as to violations of the dose limit.[29]

Plaintiffs also rely on the expert report prepared by W. Gale Biggs regarding air pathways to show possible exposures to Plaintiffs from the St. Lucie plant.  Plaintiffs'

---

[28] To the extent the Court's analysis of <u>Daubert</u> issues is relevant to the issues on summary judgment, that part of the Order is incorporated herein.

[29] In this respect Blanch's report is similar to that of Dr. Quinn, discussed *supra* at n. 13.

App. 15.  Biggs concludes that wind data demonstrate that emissions from the nuclear facility can travel toward the residential areas to the west of the plant.  Once again, however, while showing a potential pathway if the dose limit was breached, this report does not aid Plaintiffs in showing a genuine issue of disputed fact as to breach of the dose limit.

In support of its motion for final summary judgment, Defendant argues that the Court must defer to a federal agency's factual findings within that agency's area of expertise.  Federal Power Commission v. Florida Power & Light Co., 404 U.S. 453, 463 (1972) ("Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on 'engineering and scientific' considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.").  While this particular decision concerned judicial review of an agency's administrative action, the Court finds this standard relevant to this particular case.  The Court does not intend to suggest that the NRC and FDHRS reports are completely unassailable and immune to challenge.  Rather, to discredit the reports sufficiently to create a genuine issue of material fact or to allow experts to opine on other radioactive source terms than those found by the federal and state government, Plaintiffs must do more than present plausible, yet speculative, theories about the amount of radiation released by the St. Lucie nuclear plant.

IV. CONCLUSION

Although this case involves complex legal and scientific issues, and while the Court by no means intends to minimize these complexities,[30] this case essentially boils down to Defendant's reliance on contemporaneous federal and state government tests of releases to the environment, as opposed to Plaintiffs' theory of Defendant's complicity in government incompetence to cover up the actual severity of these releases.  While Plaintiffs have presented qualified scientific and medical expert testimony that may create an issue of fact as to general causation (if the 2.0 epidemiological threshold is not required for radiation cases and if their speculative theory of the amount of radioactive release is correct) there still is no admissible evidence to support their theory that Defendant exceeded the dose limit.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.     Plaintiffs' Motion for Partial Summary Judgment [DE 288 in Case No. 03-14040] is hereby **DENIED**;

2.     Plaintiffs' Motions for hearing or oral argument regarding expert witnesses [DE 329, 337-2/293-2, 338, 350-2/303-2, 353/306, 361/311] are hereby **GRANTED**, *nunc pro tunc*, as such hearing and argument was held by this Court;

3.     Plaintiffs' Motion to Strike/Exclude Defense Experts Poston, Mattson, and Daniel [DE 294 and 321, 301/267 and 302/268] are hereby **DENIED**;

4.     Defendant's Motions to Exclude Expert Testimony of Waligora [DE 303/269],

---

[30] The Court notes that no party formally requested the Court to appoint an independent expert to aid the Court in evaluating the scientific evidence.  See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1348-49 (11th Cir. 2003).

36

Resnikoff [DE 307/273], and Gundersen [DE 311/277] are hereby **GRANTED**;

5.      Defendant's Motion to Exclude Expert Testimony of Dr. Hari Sharma [DE 309/275] is hereby **DENIED**;

6.      Defendant's Motion to Exclude Expert Testimony of Dr. Christopher C. Busby [DE 314/279] is hereby **GRANTED in part**, as explained above;

7.      Defendant's Motion to Exclude Expert Testimony of Malin Dollinger [DE 317/282] is hereby **DENIED**;

8.      Defendant's Motion to Exclude Expert Testimony of Dr. Robert Gale [DE 305/271] is hereby **GRANTED**;

9.      Plaintiffs' Motions to Exclude or Motion in limine to limit Defense Experts Hunter [DE 335/291], Montgomery  [DE 350-1/303-1] and Heber [DE 352/305] are hereby **GRANTED**, as explained above;

10.     Plaintiffs' Motions to Exclude Expert Testimony of John Frazier [DE 337-1/293-1] is hereby **DENIED**;

11.     Defendants' Motion for Final Summary Judgment [DE 289 in Case No. 03-14040 and DE 257 in Case No. 03-14128] is hereby **GRANTED**.  The Court shall separately enter a judgment for Defendant in this case.

12.     Plaintiffs' Dispositive Motion to Strike FPL's Pleadings, or such relief as this Court deems appropriate and just [DE 456/404] is hereby **DENIED**;

13.     Any other pending motion to exclude listed above is hereby denied as moot given

the Court's rulings on the motion for summary judgment.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida,

this _5th_ day of January, 2006.

JAMES I. COHN
United States District Judge

copies to:
Nancy La Vista, Esq.
Robert J. McKee, Esq.
Stuart Smith, Esq.
Alvin B. Davis, Esq./Patrick O'Connor, Esq.
Donald E. Jose, Esq./Kristen Komer, Esq.

38